# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF VIRGINIA
### ABINGDON DIVISION

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | ) | |
| | ) | |
| | ) | Case No. 1:02CR00136 |
| | ) | |
| v. | ) | **OPINION AND ORDER** |
| | ) | |
| **HERBERT G. EVANS, JR.,** | ) | By: James P. Jones |
| | ) | Chief United States District Judge |
| Defendant. | ) | |

*S. Randall Ramseyer, Assistant United States Attorney, Abingdon, Virginia, for United States of America; Monroe Jamison, Abingdon, Virginia, for Defendant.*

In this criminal prosecution, the government has moved for permission to involuntarily medicate the defendant in order to render him competent to stand trial. For the foregoing reasons, and subject to the strict conditions set forth herein, I will grant the government's motion.

## I. BACKGROUND.

The defendant Herbert G. Evans is charged with forcibly interfering with a United States Department of Agriculture employee and threatening to murder a magistrate judge. Evans suffers from paranoid schizophrenia and it is agreed that he is incompetent to stand trial. Evans has refused antipsychotic medication to restore

his competency and in 2003 the government moved for authorization to medicate him involuntarily. After a hearing, and applying the four-part test articulated by the Supreme Court in *Sell v. United States*, 539 U.S. 166 (2003), I granted the government's motion. *United States v. Evans*, No. 1:02CR00136, 2004 WL 533473 (W.D.Va. Mar. 18, 2004).

Evans appealed, arguing that the first, second, and fourth prongs of *Sell* were unmet.[1] The Fourth Circuit vacated this court's decision and remanded for further proceedings. *United States v. Evans*, 404 F.3d 227 (4th Cir. 2005). In its opinion, the court of appeals disagreed with Evans regarding *Sell*'s first prong, holding that there was adequate evidence that the government's prosecutorial interest was sufficiently important to involuntarily mediate Evans. *Id.* at 238, 239-240. However, it found erroneous my factual conclusions regarding the second and fourth *Sell* prongs—whether the government had adequately demonstrated that its prosecutorial interest was significantly furthered by involuntary medication, and whether involuntary medication was medically appropriate. It held that the government had failed to articulate with sufficient particularity the medications it planned to

---

[1] The third prong, whether medication is necessary, is not at issue here. I originally resolved the necessity requirement in the government's favor, and that finding was not challenged on appeal.

- 2 -

administer to Evans, the potential side effects particular to Evans' medical condition, and a plan for responding to the onset of such side effects. *Id*. at 240-41.

In its opinion, the Fourth Circuit "emphasized that [the *Sell*] principles require an exacting focus on the personal characteristics of the individual defendant and the particular drugs the Government seeks to administer." *United States v. Baldovinos*, 434 F.3d 233, 240 n.5 (4th Cir. 2006) (characterizing *Evans* decision).

Following remand, the government submitted to the court a new forensic evaluation prepared at the Federal Medical Center in Butner, North Carolina ("Butner"). In response to the Fourth Circuit's finding of a lack of specificity, the new evaluation (the "Butner Report") detailed the process by which the government proposed to involuntarily medicate Evans, and included the particular medications and dosages to be used, the methods of administering those drugs, and a treatment plan for responding to side effects. In reply to the Butner Report, Evans submitted a report co-authored by Margaret S. Robbins, M.D., and Thomas E. Schacht, Psy.D., ("Robbins Report"), which included objections to the course of treatment proposed in the Butner Report and rebutted the analysis regarding the cited literature review. Both reports are summarized in greater detail hereafter.

On February 10, 2006, an evidentiary hearing was held in obedience to the directions of the court of appeals relating to the second and fourth *Sell* prongs.

- 3 -

Testifying at that hearing were Byron Herbel, M.D., a psychiatrist at Butner, for the government, and Drs. Robbins and Schacht for the defendant. The parties have timely submitted additional briefing, and the issues are now ripe for decision.

## II. THE FORENSIC EVALUATIONS.

### *The Butner Report*.

I begin by setting out the treatment plan proposed by the Butner Report. Butner proposes treating Evans first with long-acting risperidone (Risperdal Consta), a second-generation antipsychotic medication, to be administered by injection. In order to determine Evans' ability to tolerate risperidone, Butner proposes administering small test doses of short-acting risperidone over the course of two days: one-half milligram on day one, and one milligram on day two. In administering the initial doses, Butner would first attempt to persuade Evans to ingest the oral doses voluntarily; if he refuses, Butner proposes to restrain Evans, insert a nasogastric tube, and administer the test doses in that manner.

If Evans tolerates the test doses with no adverse reaction, Butner proposes beginning injections of twenty-five milligram doses at two-week intervals, monitoring Evans for therapeutic benefit and medication side effects. Sustained release of the medication would begin approximately four weeks after the initial

- 4 -

injection. The report predicts that symptoms would begin to improve after six to eight weeks, though an adequate antipsychotic trial would only be reached after three to four months of continuous treatment. Serum risperidone levels could be obtained to provide guidance for dosage adjustments up to fifty milligrams every two weeks. If after an adequate medication trial Evans' symptoms continue to be resistant, then treatment with a substitute antipsychotic medication should be considered.

The Butner Report provides that during the risperidone treatment, Evans would be monitored for neuromuscular and metabolic side effects, the latter being more prevalent with second-generation drugs. The report provides a specific plan for administering adjunctive medication to manage any neuromuscular side effects that manifest, including treatment with an alternative antipsychotic should the side effects persist despite adjunctive treatment. Also during the risperidone treatment, Evans would be monitored for negative effects on his diabetes, using the standard Butner protocols including weighing, body mass index recordings, fingerstick glucose, and serum lipid measure, all on a monthly basis. Evans would also be counseled on relevant lifestyle modifications should side effects arise.

If it became necessary to discontinue the risperidone treatment, the Butner Report suggests a first alternative plan using long-acting haloperidol (Haldol Decanoate) in an injectable form, implementing a similar test dose strategy as with

the risperidone treatment.  Initially, Evans would be administered  test doses of one milligram for two days, either in oral form or through injection, depending on Evans' cooperation.  A nasogastric tube is not indicated for administration of haloperidol. Barring any adverse event following the test doses, Evans would be administered twenty-five milligrams of long-acting haloperidol at two-week intervals.  With serum haloperidol monitoring, the dose could be increased not to exceed 150 milligrams in a four-week period.

The Butner Report proposes a second alternative treatment plan, which would require Evans to cooperate consistently[2] with daily ingestion of an alternative second-generation oral antipsychotic medication, aripiprazole, in daily 7.5 milligram doses. After an observation period, the report provides that the dose would be increased by increments of 7.5 milligrams as clinically indicated up to forty-five milligrams daily. A third alternative treatment plan would require Evans' consistent cooperation in ingesting daily doses of second-generation antipsychotic ziprasidone in twenty milligram oral doses daily.  After a period of observation, the report provides that the dose could be increased by increments of twenty milligrams up to an eighty milligram dose twice daily.

---

[2]  The Butner Report predicts that Evans' cooperation is unlikely.

Case 1:02-cr-00136-JPJ   Document 108   Filed 04/20/06   Page 6 of 26   Pageid#: 331

In addition to the treatment plan and the literature review summarized in more detail below, the Butner Report offered an extended history of Evans' mental health treatment, including two instances of involuntary medication using haloperidol injections in the 1980s, although treatment records noting specific doses and duration are sparse. Other records show that Evans was hospitalized three times at Southwestern State Hospital. In 1976, he received no medication; in 1979, he was treated with Mellaril, though his delusions persisted throughout treatment. In January 1981, Evans took Serentil for four days, but was then forcibly medicated in February with "calmer" results that were recorded only as long as his brief hospitalization. Evans advised that during these hospitalizations, he experienced serious neuromuscular side effects, including drooling, pacing, and jaw locking and characterized the experience as "torture."

In 1984, during Evans' last hospitalization, he was again treated with Mellaril, resulting in minimization of his delusional beliefs. It is the 1984 successful treatment history upon which the Butner Report relies to support its opinion that Evans' symptoms are not treatment-resistant.

In arguing that the involuntary medication of Evans meets the *Sell* standard, the Butner Report provides a number of empirical data studies indicating a substantial success rate with involuntary medication for patients like Evans. Two studies by

- 7 -

Ladds and colleagues support the premise. The Ladds studies involved a group of sixty-one incompetent pretrial defendants referred for involuntary psychotropic treatment. Of the forty-five who were involuntarily medicated, eighty-seven percent were rendered competent.

The Butner Report also cited guidelines of the American Psychiatric Association ("APA") issued in 2004 for treating schizophrenia, which provide a number of statistics related to treatment of schizophrenia. The guidelines provide that first-episode patients are more responsive to treatment, multi-episode patients are slightly less responsive, and all patients are subject to relapse within one or two years. Ten to thirty percent of patients will have little to no response to treatment, and an additional thirty percent exhibit some response. Factors relevant to Evans that predict poor treatment response include male gender, severe hallucinations and delusions, history of side effects, and long duration of untreated psychosis. The Butner Report contends that applying the APA guidelines relevant to Evans suggests a probability of competency restoration between ninety percent in the best case and forty percent in the worst case. An additional study provided that group probabilities do not speak to individual cases given the unpredictability of the illness itself.

The report also cited a study by Lasser, which considered the favorable response of fifty-seven elderly individuals with schizophrenia or a related disorder

- 8 -

to treatment with long-acting risperidone. Treatment resulted in significant improvement of symptoms with a "low rate" of adverse side effects.

The Butner Report cited a record review not yet published by Stelmach, involving twenty-one patients with delusional disorder admitted to Butner for competency restoration. Sixteen of the twenty-one were restored to competency after treatment with antipsychotic medication. No patients met the particular profile of Evans.

The report contains a number of additional studies, summaries of which are not necessary here.

The Butner Report offered empirical data rebutting Dr. Robbins' opinion that Evans' delusions are impervious to medication. While the Butner physicians found no data on patients specifically matching Evans' profile, there was data supporting a more optimistic outcome than that suggested by Dr. Robbins. A study by Tirupati and colleagues described one-year treatment outcomes for forty-nine patients with schizophrenia left untreated for many years. In that case, forty-seven percent of patients having been ill for five years or less had good outcomes, while only six percent of those untreated for over fifteen years had good outcomes. However, the the data sample was unlike Evans because Evans has a high level of functioning despite his long history of illness. The report contends that the data from all the

- 9 -

studies cited, when viewed in light of the characteristics distinguishing Evans from the study samples and his history of positive response to treatment with medication, indicates that treatment is more likely than not to restore him to competency.

In brief, the Butner Report responds to the Fourth Circuit's remand order by setting out a carefully detailed initial treatment plan followed by a number of alternatives, a plan for monitoring and responding to side effects generally and related specifically to Evans' medical condition, and a literature review supportive of its position.

*The Robbins Report.*

The Robbins Report offered a number of objections to the Butner Report's proposed course of treatment, and offered alternative analysis regarding the studies cited by that report. Dr. Robbins' arguments are summarized briefly below.

With regard to the specific treatment plan proposed for Evans, Dr. Robbins opined that antipsychotic medication is unlikely to restore his competency. She believes that the long duration of his delusions without treatment, when combined with the fact that the substance of Evans' delusions correlates so accurately with his current legal status, results in delusions that would be particularly treatment-resistant. It is also Dr. Robbins' position that, when taking all of the relevant factors into

- 10 -

account, and in particular the negative factors listed in the APA Practice Guidelines,[3] Evans' delusions are likely impervious to medication. In support of that assertion, Dr. Robbins looks to the Tirupati and Silva studies cited by the Butner Report. Tirupati, which does not address delusional patients, shows that long duration of untreated psychosis, at least twenty years in Evans' case, produces "dismal" prospects for treatment with medication. Silva's study produced seven delusional patients, none of whom responded to medication.

In response to the government's contention that the 1984 positive treatment response proves that Evans' delusions are not impervious to medication, Dr. Schacht testified that when the medical history is viewed as a whole, one observes many more instances in which medication was not successful in treating Evans' symptoms. Further, Dr. Schacht indicated that "fair remission," as indicated in the treatment notes, does not necessarily correlate with other treatment notes indicating persistent delusions, and has no consistent medical meaning.

Dr. Robbins did not offer objections to the particular medications prescribed in the Butner Report, although she strongly opposed the use of a nasogastric tube for

---

[3] As detailed above, factors suggesting an unfavorable treatment outcome for Evans include the fact that Evans is male, the long duration of Evans' untreated psychosis, his long-standing negative attitudes about treatment, the severity of his delusions, a history of side effects, and the provision of medication in an adversarial context.

the administration of the test doses. Both Dr. Robbins' report and her testimony at the hearing indicated that the risks involved in inserting a nasogastric tube, particularly on an uncooperative, combative patient, far outweighed its possible benefits. Dr. Robbins recommended that a test dose be administered in a soluble tablet form, which dissolves immediately upon contact with a moist surface and provides minimal risk of harm to an uncooperative or combative patient.

The Robbins Report also criticizes the particularity with which the Butner treatment plan proposes to respond to side effects relating to Evans' high blood pressure and diabetes, particularly in light of the fact that side effects most prevalent with second-generation antipsychotics, like risperidone, are metabolic in nature. The proposed treatment plan provides in general terms that it will monitor for side effects using a standard protocol, and will refer Evans to medical management should his diabetes worsen. However, Dr. Robbins points out that the plan fails to set out the specific conditions which, if reached, would or should result in discontinuing treatment or other measures.[4]

The Robbins Report further criticizes the treatment plan's lack of specificity regarding a response to negative side effects relating to Evans' hypertension.

---

[4] For example, the Robbins Report queries the specific actions to be taken should Evans' diabetic condition, currently managed by oral medication, worsen to the point of requiring daily insulin injections.

Particularly, the report's concerns are based on the potential for low blood pressure caused by simultaneous treatment with risperidone and Evans' antihypertensive medication. Also criticized is the Butner Report's failure to consider the possibility of increased hypertension induced by stressful encounters related to Evans being medicated against his will.

The Robbins Report also critiques the Butner Report's statements regarding possible side effects caused by treatment with antipsychotic medication. With regard to the Lasser study involving the use of long-acting risperidone on elderly patients, Dr. Robbins points to the fact that while the study reports a "low rate" of side effects, that rate is never explicitly quantified in the report. Dr. Robbins contends that the court should reach its own conclusion regarding whether the side effect incidence in Lasser was, in fact, low. Further, Dr. Robbins contends that Evans is distinguishable from the patients included in the Lasser study because, in relevant part, those patients had been previously stabilized on oral risperidone for at least two weeks. According to Dr. Robbins, the Lasser study speaks most clearly about patients who, unlike Evans, have already tolerated and benefited from voluntary treatment with antipsychotic medication. The report also states that, generally, the possibility of side effects capable of hindering Evans' defense cannot be adequately predicted in advance.

- 13 -

Generally and in response to the literature review proffered by the Butner Report, the Robbins Report and related hearing testimony assert that the individuals included in the group research studies cited by the Butner Report lack important similarities to Evans' particular diagnosis and symptoms, namely that Evans carries a delusional diagnosis rather than a diagnosis of generalized schizophrenia. Additional factors lacking from group research are Evans' long duration of untreated psychosis, long-standing negative attitudes toward treatment, and the administration of medication in an adversarial manner. Further, the report disputes the Butner Report's equation of "positive treatment response" with "restoration of competency," arguing that medicating Evans may result in positive responses, e.g., reduction in agitation, that have no impact on his overall competency.

With respect to the particular reports cited, the Robbins Report rebutted the Butner Report's conclusions regarding the Ladds studies, noting a lack of comparison to a control group, lack of report on the duration of untreated psychosis, and an inflated success rate, among other criticisms. Dr. Schacht's testimony at the hearing offered a similar criticism. The Robbins Report offers additional specific critiques to each of the studies cited by the Butner Report, which I will not detail here.

On the whole, Dr. Robbins believes that antipsychotic medication is unlikely to return Evans to competency, and that the *Sell* prongs therefore cannot be met.

- 14 -

I next review the evidence in light of the legal standard articulated by the Supreme Court and make the necessary findings of fact.

### III. ANALYSIS.

#### *Sell v. United States.*

In *Sell v. United States*, 539 U.S. 166 (2003), the Supreme Court clarified the legal standard the government is required to meet in seeking the involuntary medication of a defendant for the purpose of rendering the defendant competent to stand trial. It held that the government may involuntarily medicate a defendant so long as (1) the government prosecutorial interest is "important," (2) involuntary medication will "significantly further" that interest, (3) involuntary medication is necessary to further that interest, and (4) involuntary medication is "medically appropriate." *Id*. at 180-81. While the Supreme Court in *Sell* failed to articulate a standard of proof to govern consideration of this sort of claim, the parties do not seriously dispute that the appropriate standard requires the government to prove its case by clear and convincing evidence. Accordingly, I will evaluate the government's case under that standard.

Pursuant to the Fourth Circuit's remand, only the second and fourth prongs are relevant to these proceedings. I will review each in turn.

- 15 -

*"Significantly Further."*

*Sell*'s second prong requires the government to show that involuntary medication will "significantly further" its prosecutorial interest. Involuntary medication "significantly furthers" the government's prosecutorial interest when it is (1) substantially likely to render the defendant competent to stand trial and (2) substantially unlikely to produce side effects that will significantly interfere with the defendant's ability to assist his counsel at trial, thereby rendering the trial unfair. *Id.* at 181.

After carefully reviewing the record in this case, I find that involuntary medication is substantially likely to render Evans competent to stand trial, and is substantially unlikely to produce side effects that will significantly interfere with Evans' defense.

I find persuasive a number of factors contained in the Butner Report. The Ladds study, finding an eighty-seven percent return to competency by those forcibly medicated, is compelling evidence regarding the probability of restoring Evans' competency in this case. Also persuasive is Dr. Herbel's opinion that Evans' 1984 positive response to antipsychotic medication[5] after twenty years of no treatment

---

[5] The record indicates that in 1984, Evans was forcibly medicated with a relatively low dose of antipsychotic medication, and that the medication was successful in restoring his competency.

suggests that Evans may reasonably be expected to have a similar outcome when treated again with antipsychotic medication. Relatedly, I find convincing Dr. Herbel's opinion that Evans' high level of functioning suggests that, notwithstanding his years without treatment, he has not suffered a decreased response thereof, and that, in his own day-to-day experience, a patient's negative view of medication is not associated with a decreased response to treatment.[6]

Taking all of the factors into consideration, Dr. Herbel opined that Evans maintained an estimated seventy to eighty percent chance of being restored to competency. Dr. Robbins, testifying on behalf of Evans, admitted that even though she believes it unlikely that medication will restore Evans to competency, involuntary medication for the purpose of restoring competency is appropriate in some situations. I find that Dr. Herbel's opinion, when considered in light of the evidence and scientific studies produced in the Butner Report, presents clear and convincing proof that Evans is substantially likely to be restored to competency for trial purposes.

---

[6]  At the hearing, Dr. Herbel testified that he had personally been involved in eighty involuntary medications, although the majority were medicated absent the use of force. Dr. Herbel recalled twenty-two incidents in the last calendar year requiring the use of force for involuntary medication, of which seventy-seven percent resulted in competency restoration. No forced medication in the past year, and only one forced medication in thirteen years resulted in an injury to the patient.

I also find clear and convincing evidence to support the government's assertion that involuntarily medicating Evans is substantially unlikely to produce side effects rendering him incapable of assisting in his defense. While it is apparent from the literature cited by the Butner Report that troublesome side effects, mainly metabolic in nature, are common with second-generation antipsychotics, they generally are not so serious as to inhibit Evans' assistance with his own defense. During treatment, Evans' high blood pressure and diabetes will be closely monitored, but do not add to the risk of nor enhance the severity of side effects. Neither does there appear to be a strong risk that the subject matter and deep-seeded nature of Evans' delusions will significantly interfere with his defense despite treatment. Further, the treatment plan proposed by Butner consistently calls for close monitoring of Evans' response to the drugs, as evidenced by the use of test doses, serum level testing, and commitment to using the lowest effective dose.

Accordingly, after taking into consideration all of the evidence presented in the reports and at the evidentiary hearing, I find that the government has met its burden with respect to *Sell*'s second prong, namely, that involuntary medication of Evans will significantly further its prosecutorial interest.

*"Medically Appropriate."*

*Sell*'s fourth prong requires a finding that involuntary medication is medically appropriate, or in the best interest of the patient in light of his medical condition. *Sell*, 539 U.S. at 181. *Sell* counseled that a court should consider the specific kind of drug administered, its side effects, and its levels of success. *Id.*

The Butner Report specifically considers whether involuntary medication is medically appropriate under the circumstances and reaches an affirmative conclusion that it is appropriate. In support, the Butner Report included an article by Lasser, detailing a study of favorable treatment response of long-acting risperidone on fifty-seven elderly patients with schizophrenia. Treatment resulted in a low rate of adverse side effects caused by the medicine.

Further, as described in detail above and in accordance with the Fourth Circuit's remand, *see Evans*, 404 F.3d at 242, the Butner Report proposes in clear, careful detail a primary course of treatment with three alternatives, an estimated length of time after which Evans' competency would be restored, criteria to be used in determining when treatment should be discontinued, a plan for monitoring for possible side effects specific to Evans' condition and medical history, and an explanation of the benefits and costs of such treatment. I find, with two exceptions

- 19 -

explained below, that the government's contention that the proposed course of treatment is medically appropriate is supported by clear and convincing evidence.

Dr. Herbel reported that antipsychotic medication "is the only intervention that will be likely to restore [Evans'] competency to stand trial." (Tr. at 46.) Because Evans' has expressed an intent to be uncooperative with medication, the Butner Report chose a long-acting antipsychotic, risperidone, in order to reduce the necessity for forceful encounters with Evans in administering the medication. A second-generation antipsychotic was chosen for the first course of treatment in order to avoid the neuromuscular side effects Evans experienced previously with exposure to haloperidol, though both psychiatrists at the hearing testified that the past side effects were likely caused by overdosing. Risperidone is the only second-generation antipsychotic available in a long-acting form.

As to treatment duration, Dr. Herbel testified at the evidentiary hearing that Evans would need to be treated with an antipsychotic medication for between four and five months in order to restore him to competency. If Evans failed to respond within five months, the government would seek leave to begin administering an alternative antipsychotic medication for an additional four to five months. Treatment would be discontinued either after two five-month treatment cycles with

two separate antipsychotics followed by no improvement in Evans' condition, or earlier with the onset of intolerable side effects.

As detailed above, the Butner Report clearly sets out the side effects that may potentially arise with the use of antipsychotic drugs, and describes a specific plan to be carried out in monitoring Evans' response to the drugs. Because second-generation antipsychotics produce metabolic side effects that could potentially affect Evans' blood sugar and high blood pressure, both would be closely monitored during his treatment. Risk of such side effects is reduced due to the fact that the Butner Report ruled out using those second-generation antipsychotic drugs with the highest propensity for metabolic side effects. Onset of any side effects would be addressed though a doctor-patient meeting and possible drug substitution. Taken in total, I find that the government's proposals are medically appropriate and supported by clear and convincing evidence.

The government has failed to meet its burden with regard to the proposed use of a nasogastric tube for administration of test doses. The Butner Report and testimony at the hearing propose restraining Evans and inserting a tube through his nose into his stomach, and administering small, short-acting doses of antipsychotic medication as a means of gauging Evans' tolerance of the drug. While sound reasoning supports the administration of test doses of risperidone prior to use of the

- 21 -

long-acting version, the medical appropriateness of using a tube for that purpose is not supported by clear and convincing evidence. Risks involved in inserting the tube include accidental passage into the pulmonary tract and perforation of the esophagus, all of which are more likely in patients, like Evans, who are uncooperative during insertion. Dr. Robbins characterized the risks as "life-threatening" at the evidentiary hearing. (Tr. at 136.) Medical appropriateness is made more questionable in light of the fact that risperidone appears to be available in an orally disintegrating tablet form.[7] The risks associated with the use of a nasogastric tube outweigh the benefits of treatment in this case. Accordingly, because the government has failed to meet its burden of proof on this issue, I find that the test doses of risperidone must be administered in soluble tablet form instead of by a nasogastric tube.

The government has also failed to meet its burden with regard to its proposed response to a worsening of Evans' diabetes. Currently, Evans' diabetes can be managed with daily oral medication, which Evans takes voluntarily. While the Butner Report sets out a means of monitoring Evans' glucose and insulin levels and generally takes into consideration the potential for a worsening of Evans' diabetes, the report fails to provide in adequate detail the actual steps to be taken should Evans'

---

[7] Risperdal M-Tab®. *See* http://www.risperdal.com/html/ris/consumer/pd_risperidone .xml?article=dosing.jspf.

- 22 -

diabetes in fact worsen, particularly to the point of requiring daily insulin shots. I do not find clear and convincing evidence that the current treatment plan is medically appropriate with regard to a worsening of Evans' diabetes. Accordingly, because the government has failed to meet its burden of proof on this issue, I will direct that, in the event that Evans' diabetes worsens to the point of requiring daily insulin shots, the government must cease treatment with the antipsychotic currently in use and return to this court with a new proposal.

IV. CONCLUSION.

For the foregoing reasons and pursuant to the following conditions, the government's motion to involuntarily medicate Evans is GRANTED. It is ORDERED that the government may involuntarily medicate Evans in an effort to restore him to competency subject to the following conditions:

1.     The government may initiate treatment with risperidone pursuant to the dosing schedule provided in its proposed treatment plan:

        a.     The government may administer test doses of short-acting risperidone;

- 23 -

        b.      The government must <u>not</u> administer test doses using a nasogastric tube, but may use short-acting risperidone only in an oral form or in a soluble tablet form;

        c.      If Evans tolerates the test doses, the government may administer long-acting risperidone by injection pursuant to the dosing schedule provided in its proposed treatment plan for no longer than five months.

2.     If risperidone test doses are unable to be given, or if risperidone treatment fails due to lack of effect on symptoms or the onset of intolerable side effects, the government may treat Evans with haloperidol:

        a.      The government may administer test doses of short-acting haloperidol in the oral or injectable forms;

        b.      If Evans tolerates the test doses, the government may administer long-acting haloperidol by injection pursuant to the dosing schedule provided in its proposed treatment plan for no longer than five months;

- 24 -

3.     If haloperidol treatment fails due to the onset of intolerable side effects, the government may initiate treatment with aripiprazole pursuant to the dosing schedule set out in its treatment plan.

4.     If aripiprazole treatment fails due to the onset of intolerable side effects, the government may initiate treatment with ziprasidone pursuant to the dosing schedule set out in its treatment plan.

5.     The total course of treatment must not last longer than ten months; after ten months, all antipsychotic medication must cease and the government must return to this court with a new proposal.

6.     The government must monitor Evans for neuromuscular, metabolic, and other side effects during all treatment, and, in particular, for side effects related to his diabetes and hypertension.

7.     If at any time during treatment Evans' diabetes reaches a level requiring daily insulin injections, all antipsychotic medication must cease and the government must return to this court with a new proposal.

8.     The government must not deviate from its proposed treatment plan or from the directions set forth above without first obtaining permission of this court.

- 25 -

ENTER: April 20, 2006

/s/ JAMES P. JONES
Chief United States District Judge